**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

PEOPLE FOR THE ETHICAL
TREATMENT OF ANIMALS, INC.,

     **Plaintiff,**

        **v.**                            **Civil Action No. 13-976 (JEB)**

UNITED STATES DEPARTMENT OF
AGRICULTURE, *et al.*,

     **Defendants.**

---

## MEMORANDUM OPINION

The nation's circle of concern expanded a little wider in 2002 when Congress amended the Animal Welfare Act to include birds as creatures deserving of legal protection.  The agency charged with implementing the Act – the United States Department of Agriculture – has, however, so far failed to defend the country's feathered friends, both by not enforcing the Act against bird abusers and by not promulgating regulations specific to the mistreatment of avians.  People for the Ethical Treatment of Animals, Inc., a non-profit organization dedicated to preventing cruelty to animals, has brought this lawsuit against USDA and its Secretary in order to compel the agency to follow through on the 2002 amendment and put a stop to the inhumane treatment of birds.  Specifically, PETA wants USDA to immediately begin enforcing the AWA against entities that mistreat birds and to publish new animal-welfare regulations specific to birds' unique needs.

Defendants now move to dismiss the Complaint.  They claim that PETA lacks standing to bring this case and that the AWA commits these issues to USDA's discretion.  Although PETA presents some strong arguments, the Court ultimately finds that the AWA gives USDA complete

discretion on decisions here relating to enforcement and promulgation of animal-specific

regulations.  The Court thus must grant Defendants' Motion.

## I.      Background

Congress enacted the Animal Welfare Act in 1966 in order "to insure that animals

intended for use in research facilities or for exhibition purposes or for use as pets are provided

humane care and treatment" and "to assure the humane treatment of animals during

transportation in commerce."  7 U.S.C. § 2131(1) & (2).  The Act therefore instructs the

Secretary of USDA both to "promulgate standards to govern the humane handling, care,

treatment, and transportation of animals by dealers, research facilities, and exhibitors," id. §

2143(a)(1), and to "make such investigations or inspections as he deems necessary to determine

whether any [person or entity subject to the AWA] has violated or is violating" the AWA or its

implementing regulations.  Id. § 2146(a).

The AWA, however, does not protect every subject of the animal kingdom.  Before 2002,

the Act defined the term "animal" to include "any live or dead dog, cat, monkey (nonhuman

primate mammal), guinea pig, hamster, rabbit, or such other warmed-blooded animal, as the

Secretary may determine is being used, or is intended for use for research, teaching, testing,

experimentation, or exhibition purposes, or as a pet."  Animal Welfare; Definition of Animal, 69

Fed. Reg. 31,513, 31,513 (June 4, 2004) (citing 7 U.S.C. § 2132(g)).  USDA therefore concluded

that birds were excluded from coverage under the AWA and limited the scope of its regulations

accordingly.  See Animal Welfare; Regulations and Standards for Birds, Rats, and Mice, 69 Fed.

Reg. 31,537, 31,537 (June 4, 2004).

In 2002, however, Congress amended the statutory definition of "animal" to specifically

exclude "birds, rats of the genus Rattus, and mice of the genus Mus, bred for use in research."  7

U.S.C. § 2132(g) (emphasis added).  USDA read this new language to mean that Congress intended to include within the definition of "animal" birds not bred for research, and so the agency followed suit by amending its own regulations to "narrow[] the scope of the exclusion for birds to only those birds bred for use in research."  Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. at 31,537.  The parties agree that non-research birds are now protected by the AWA.  See Mot. at 3-4; Opp. at 4.

Pursuant to the Act, USDA has also promulgated regulations specific to certain creatures.  For instance, dogs, cats, nonhuman primates, guinea pigs, hamsters, rabbits, and marine mammals are all governed by their own unique regulatory standards.  See 9 C.F.R. §§ 3.1-3.118.  Other animals covered by the AWA – from aardvarks to zebras – are protected by a set of general standards.  See id. §§ 3.125-3.142.  These rules ensure that the animals are treated humanely by setting minimum standards for matters such as veterinary care, potable water, housing, and lighting.  See generally id.

USDA has not, so far, promulgated any regulations specific to birds.  In 2004, the agency announced that it "intend[ed] to extend enforcement of the AWA to birds," but that "before [it could] begin enforcing the AWA with respect to . . . birds, [it] believe[d] it is necessary to consider what regulations and standards are appropriate for them."  Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. at 31,538-39.  The agency thus sought "comments from the public to aid in the development of appropriate standards for birds."  Id. at 31,539.  In response, it received over 7,000 comments on the subject, see Mot., Exh. 1 (Declaration of Johanna Briscoe), ¶ 6, and it has consulted with veterinarians, economists, industry members, related government agencies, and other stakeholders in order to develop a proposed set of regulations specific to avians.  See id., ¶¶ 8-11.  But in the nine years since the comment period

closed, no such regulations have issued.  Instead, with surprising regularity, the agency has repeatedly set, missed, and then rescheduled deadlines for the publication of proposed bird-specific regulations.  See Opp. at 6-7 (collecting citations).

Even without specific regulations to protect them, birds, in theory, remain covered by USDA's general animal-welfare regulations.  Yet, according to PETA, USDA has failed to enforce even those general regulations with respect to birds.  Despite USDA's official position that avians are protected by the AWA, USDA officials have repeatedly responded to complaints about the inhumane treatment of birds by claiming either that they are not regulated by USDA or that they do not fall under USDA jurisdiction.  See Opp., Att. 2 (Declaration of Jeffrey S. Kerr), ¶ 7; see also Opp., Exhs. 1-5 (USDA documents).  Indeed, USDA is not even on the same page as its own FOIA Director, who answered a request for information related to the agency's investigations into avian mistreatment by explaining that "Agency employees conducted a thorough search of their files and advised our office that birds are not being regulated."  Opp., Exh. 7 (FOIA Letter).

PETA is understandably frustrated by these misrepresentations and USDA's continued inaction in regard to the inhumane treatment of birds.  The group cites a number of disturbing incidents that have gone unpunished by USDA, including zoos' failure to protect flamingoes and waterfowl in their care from fatal attacks by feral dogs and pet stores' allowing hundreds of their parakeets to die from starvation and disease.  See, e.g., Kerr Decl., ¶ 7(b)-(d).  PETA thus filed this lawsuit, seeking to compel the agency to enforce the existing general animal-welfare regulations against bird abusers and to promulgate new regulations specific to birds.  See Compl. at 7.  Defendants now move to dismiss the case.

## II.     Legal Standard

In evaluating Defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6) and 12(b)(1), the Court must "treat the complaint's factual allegations as true." Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)) (internal citation omitted); see also Jerome Stevens Pharms., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005). This standard governs the Court's considerations of Defendants' Motion under both Rules 12(b)(1) and 12(b)(6). See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) ("[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader."); Walker v. Jones, 733 F.2d 923, 925-26 (D.C. Cir. 1984) (same). The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the Complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986) (internal quotation marks omitted)).

To survive a motion to dismiss under Rule 12(b)(1), Plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v. U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000). A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority." Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). For this reason, "'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987) (alteration in original)).

Additionally, unlike with a motion to dismiss under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." Jerome Stevens, 402 F.3d at 1253; see also Venetian Casino Resort, LLC v. EEOC, 409 F.3d 359, 366 (D.C. Cir. 2005) ("[G]iven the present posture of this case—a dismissal under Rule 12(b)(1) on ripeness grounds—the court may consider materials outside the pleadings."); Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992).

Rule 12(b)(6) provides for the dismissal of an action where a complaint fails "to state a claim upon which relief can be granted." Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). A plaintiff must put forth "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Though a plaintiff may survive a 12(b)(6) motion even if "recovery is very remote and unlikely," Twombly, 550 U.S. at 556 (citing Scheuer, 416 U.S. at 236), the facts alleged in the Complaint "must be enough to raise a right to relief above the speculative level." Id. at 555.

## III.   Analysis

In seeking dismissal here, Defendants offer two arguments. First, they say that PETA lacks standing to bring this case. Second, they assert that even if PETA has standing, it has failed to state a claim upon which relief can be granted because USDA has discretion to act as it has. See Mot. at 1-2. The Court will address these issues separately.

A.  Standing

The Court begins with standing.  As standing is a "threshold jurisdictional question," the

Court must address it before moving on to the merits of the case.  Steel Co. v. Citizens for a

Better Environment, 523 U.S. 83, 102 (1998).  In order to establish standing – a prerequisite for

opening the courthouse doors – a plaintiff must allege "such a personal stake in the outcome of

the controversy as to warrant his invocation of federal [subject-matter] jurisdiction."  Havens

Realty Corp. v. Coleman, 455 U.S. 377, 378-79 (1982) (internal quotation marks omitted).

Standing comprises three elements: (1) a concrete and particularized injury suffered by the

plaintiff; (2) a traceable causal connection between the plaintiff's injury and the defendant's

challenged conduct; and (3) a likelihood that a favorable decision by the court will redress the

plaintiff's injury.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  Just like an

individual plaintiff, an organizational plaintiff such as PETA may have standing to sue in its own

right if it can demonstrate that these three requirements have been satisfied.  See Havens Realty,

455 U.S. at 378-79.  This "organizational standing" is distinct from "representational standing,"

wherein a plaintiff organization brings a suit on behalf of its members, rather than on behalf of

itself.  See Scenic America, Inc v. United States Dep't of Transp., 2013 WL 5745268, at * 3

(D.D.C. Oct. 23, 2013).

USDA argues that PETA has not established any of the three elements of standing.  The

Court disagrees.  The closest question is whether PETA has demonstrated, as required for

organizational standing, a "concrete and demonstrable injury to [its] activities – with [a]

consequent drain on [its] resources," rather than "simply a setback to [its] abstract social

interests."  Nat'l Ass'n of Home Builders v. EPA, 667 F.3d 6, 11 (D.C. Cir. 2012); see also Nat'l

Treasury Employees Union v. United States, 101 F.3d 1423, 1430 (D.C. Cir. 1996); American

7

Legal Foundation v. FCC, 808 F.2d 84, 91–92 (D.C. Cir. 1987).  Specifically, to establish an

injury-in-fact, PETA must allege "that discrete programmatic concerns are being directly and

adversely affected by" USDA's inaction.  Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d

1428, 1433 (D.C. Cir. 1995).

      PETA cites two injuries to its activities that have resulted from USDA's failure to enforce

the AWA with respect to birds.  First, "it [is] preclude[d] . . . from preventing cruelty to and

inhumane treatment of these animals through its normal process of submitting USDA

complaints," and second, "it [is] deprive[d] . . . of key information that it relies on to educate the

public," since the group typically uses USDA's AWA inspection reports in order to prepare

promotional materials on animal abuse.  See Opp. at 11; Kerr Decl., ¶¶ 9, 14-17.  As a result,

PETA says that it has been forced to expend additional resources – for instance, by pursuing

complaints about bird mistreatment through local, state, and other federal authorities and by

conducting its own investigations in order to obtain educational information on bird abuse.  See

Opp. at 12-13; Kerr Decl., ¶¶ 9-10, 14-19.

      These are real, concrete obstacles to PETA's work, rather than the kind of "abstract

concern that does not impart standing."  Nat'l Taxpayers Union, 68 F.3d at 1433.  PETA's

animal-rights programs are "perceptibly impaired" when USDA refuses to take action in

response to the group's complaints about bird abuse and when it fails to compile information the

group needs on the inhumane treatment of birds because PETA is then forced to expend

additional resources on more expensive and less effective alternatives.  Havens Realty, 455 U.S.

at 379.  The D.C. Circuit has recognized both of these harms as sufficient to confer standing on

an organization:

> [Plaintiffs] plead[] the same type of injury as the plaintiffs in
> Havens Realty: the challenged regulations deny the [plaintiff]

> organizations access to information and avenues of redress they
> wish to use in their routine . . . activities. Unlike [a] mere interest
> in a problem or ideological injury . . . the [plaintiff] organizations
> have alleged inhibition of their daily operations, an injury both
> concrete and specific to the work in which they are engaged.

Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler, 789 F.2d 931, 937-38

(D.C. Cir. 1986) (emphasis added) (internal quotation marks omitted); see also Abigail Alliance

for Better Access to Developmental Drugs v. Eschenbach, 469 F.3d 129, 132-33 (D.C. Cir.

2006); Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n, 481 F.2d 1079, 1087 n.29

(D.C. Cir. 1973).  PETA has therefore alleged an injury-in-fact.

   USDA offers several reasons why PETA's injury is insufficient, but none of its

arguments persuades.  First, USDA insists that PETA has only alleged an abstract harm to its

ideological mission, rather than a concrete harm to its activities.  This argument simply ignores

the two specific, programmatic harms that PETA has laid out in its briefs.  Second, USDA cites

Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268

(D.C. Cir. 1994), for the proposition that PETA cannot establish standing based on the self-

inflicted harm it suffered by choosing to redirect its resources in response to the agency's

inaction.  See id. at 1277.  But the D.C. Circuit has emphatically rejected precisely that reading

of BMC: "[O]ur standing analysis [does not] depend on the voluntariness or involuntariness of

the plaintiffs' expenditures.  Instead, we focus[] on whether they undertook the expenditures in

response to, and to counteract, the effects of the defendants' alleged discrimination rather than in

anticipation of litigation."  Equal Rights Ctr. v. Post Properties, Inc., 633 F.3d 1136, 1140 (D.C.

Cir. 2011).  As there is no indication that PETA's diversion of resources here was done in

anticipation of litigation, USDA's argument on this point falls flat as well.  Third, USDA argues

that an advocacy group like PETA does not suffer an injury when it is forced "to shift resources

from one advocacy agenda to another" or when its "advocacy efforts [are made] more costly."

Reply at 4.  The cases it cites for this premise, however, all deal with groups that alleged injuries

related to the costs of litigation, legal counseling, and lobbying, none of which is relevant here.

See, e.g., Ctr. For Law & Educ. v. Dep't of Educ., 396 F.3d 1152, 1161-62 (D.C. Cir. 2005);

Nat'l Taxpayers Union, 68 F.3d at 1434.  Finally, USDA suggests that the organizational-

standing doctrine is limited to cases involving disputes between private parties, see Mot. at 11-

12, or, alternatively, to cases involving challenges to government action, rather than inaction.

See Reply at 7-8.  Leaving aside the obvious contradiction between these two premises, the first

is flatly refuted by the precedent, see, e.g., Abigail Alliance, 469 F.3d at 132-33, and the second,

while one possible inference from past practice, finds no express support in any D.C. Circuit

opinion.

       Causation and redressability are simpler matters.  It is clear that the injuries complained

of – USDA's refusal to take enforcement action in response to PETA's complaints and USDA's

failure to compile the information PETA wants to use in its educational materials – are caused by

the agency.  It is also clear that the remedies sought – an order compelling USDA to enforce the

AWA with respect to birds and to promulgate more protective, bird-specific regulations – would

redress those injuries.  USDA devotes several pages of its pleadings to the argument that PETA's

injuries are actually caused by the third parties who are mistreating birds, but this defense simply

misses PETA's point.  The group's harms – a lack of redress for its complaints and a lack of

information for its membership – are traceable to its interactions with the agency, not to the

actions of third parties.  Whether the rate of bird abuse rises or falls, for instance, the harm that

PETA suffers as a result of USDA's inaction will remain the same.

The Court therefore concludes that PETA has standing as an organization to bring this case.

B. <u>Failure to State a Claim</u>

PETA's lawsuit aims to force USDA to act in two ways: (1) enforce the general AWA regulations with respect to the mistreatment of birds and (2) promulgate new AWA regulations that are specific to birds. <u>See</u> Compl. at 6-7. USDA counters that because the AWA does not require it to take either action but instead leaves both matters to the agency's discretion, PETA's suit should be dismissed. <u>See</u> Mot. at 17-18. The Court will tackle PETA's two issues in turn.

1. *Enforcement with Respect to Birds*

PETA bases its enforcement-related claim on § 706(1) of the Administrative Procedure Act, which empowers the Court to compel "agency action unlawfully withheld." 5 U.S.C. § 706(1). According to PETA, USDA's failure to prosecute violations of the AWA related to birds contravenes the Act's instruction that the agency should conduct "investigations or inspections" in order to ensure compliance with the statute. 7 U.S.C. § 2146. PETA therefore requests that this Court compel USDA to take such actions with respect to the mistreatment of birds.

USDA reminds the Court, however, that "before any review . . . may be had" under § 706, PETA "must first clear the hurdle of § 701(a)." <u>Heckler v. Chaney</u>, 470 U.S. 821, 828 (1985). Section 701(a) of the APA bars judicial review of agency action in two situations: first, if an applicable statute precludes judicial review, and second, if the agency action at issue is "committed to agency discretion by law." 5 U.S.C. § 701(a)(1) & (2). USDA invokes the second of these exceptions, claiming that the AWA commits enforcement decisions to its sole discretion.

An action is "committed to agency discretion" if "the [applicable] statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." Chaney, 470 U.S. at 830. In other words, when the applicable statute does not provide "judicially manageable standards . . . for judging how and when an agency should exercise its discretion," id., then a court has no choice but to dismiss the case because there is "no law to apply." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)); see also Claybrook v. Slater, 111 F.3d 904, 909 (D.C. Cir. 1997). "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." Chaney, 470 U.S. at 830.

One classic example of action committed to agency discretion is an agency's decision whether or not to take an enforcement action. Id. at 831. As a practical matter, an agency "generally cannot act against each technical violation of the statute it is charged with enforcing," and so every time the agency decides whether to prosecute a potential wrongdoer, it must perform "a complicated balancing of a number of factors which are peculiarly within its expertise," including "whether a violation has occurred, . . . whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and . . . whether the agency has enough resources to undertake the action at all." Id. In the face of these competing and often technical concerns, the Supreme Court has counseled humility: "The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its [enforcement] priorities." Id. at 831-32. Indeed, the Court has instructed that an agency's decision not to take an enforcement action should be considered "presumptively unreviewable" under § 701(a)(2). Id. at 832.

That presumption, however, may be rebutted if "the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 833. "Congress may limit an agency's exercise of enforcement power . . . either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." Id. In that situation, of course, there will be "law to apply," Overton Park, 401 U.S. at 410; Claybrook, 111 F.3d at 909, since the statute will provide "legislative direction" for the agency to follow and the courts to enforce. Chaney, 470 U.S. at 833.

Here, USDA invokes Chaney to argue that its enforcement decisions with respect to birds are presumptively unreviewable. That much is clear. The Court next looks to the language of the AWA to determine whether the statute "has provided guidelines for [USDA] to follow in exercising its enforcement powers." Id. at 833. Section 2146 states: "The Secretary shall make such investigations or inspections as he deems necessary to determine whether any [covered entity] . . . has violated or is violating any provision of this chapter or any regulation or standard issued thereunder." 7 U.S.C. § 2146 (emphasis added). The key phrase, of course, is "as he deems necessary." In a similar case, the Supreme Court found that language like this "fairly exude[d] deference" to the agency and "foreclose[d] the application of any meaningful judicial standard of review." Webster v. Doe, 486 U.S. 592, 600 (1988) (finding that Congress had committed CIA employee-termination decisions to CIA Director where statute allowed termination whenever the Director "shall deem such termination necessary or advisable in the interests of the United States"); see also Claybrook, 111 F.3d at 908-09. The AWA's enforcement provision "thus strongly suggests that its implementation was 'committed to agency discretion by law,'" Webster, 486 U.S. at 600 (quoting 5 U.S.C. § 701(a)(2)), which means that Section 701(a)(2) of the APA bars the Court from hearing PETA's claim on this issue.

PETA, nevertheless, has a trick up its sleeve.  Although an agency's decision not to bring a specific enforcement action is generally presumed to be unreviewable under Chaney, the D.C. Circuit has recognized an exception in cases where a plaintiff seeks judicial review of any agency's "general enforcement policy."  Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 676 (D.C. Cir. 1994); see also Edison Elec. Inst. v. EPA, 996 F.2d 326, 333 (D.C. Cir. 1993); Nat'l Wildlife Fed'n v. EPA, 980 F.2d 765, 772-73 (D.C. Cir. 1992).  According to the Court of Appeals, there are "ample reasons for distinguishing the two situations":

> [E]xpressions of broad enforcement policies are abstracted from the particular combinations of facts the agency would encounter in individual enforcement proceedings.  As general statements, they are more likely to be direct interpretations of the commands of the substantive statute rather than the sort of mingled assessments of fact, policy, and law that drive an individual enforcement decision and that are . . . peculiarly within the agency's expertise and discretion.  Second, an agency's pronouncement of a broad policy against enforcement poses special risks that it "has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities," a situation in which the normal presumption of non-reviewability may be inappropriate.  Finally, an agency will generally present a clearer (and more easily reviewable) statement of its reasons for acting when formally articulating a broadly applicable enforcement policy, whereas such statements in the context of individual decisions to for[]go enforcement tend to be cursory, ad hoc, or post hoc.  These latter cases confront courts (as here) with the task of teasing meaning out of agencies' side comments, form letters, litigation documents, and informal communications.

Crowley, 37 F.3d at 677 (quoting Chaney, 470 U.S. at 833 n.4).

Invoking this exception to Chaney, PETA contends that its challenge is judicially reviewable because it is not directed to "any of [USDA's] particular enforcement decisions, but rather [to the agency's] general policy of not regulating birds under the AWA."  Opp. at 22.  To support its contention that USDA has such a non-enforcement policy, PETA cites to a slew of incidents where USDA officials repeatedly responded to complaints about avian abuse by

claiming that birds "do not fall under USDA regulation" or were "not under [USDA] jurisdiction."  Kerr Decl., at ¶ 7.

PETA's argument has force, but because it cannot identify any concrete statement from USDA announcing a general policy not to regulate birds under the AWA, the group cannot prevail on this point.  On the contrary, USDA says that it "expressed its official position" on the matter "when it promulgated regulations bringing birds under the scope of the AWA."  Reply at 17 n.13.  In 2004, moreover, the agency published an Advance Notice of Rulemaking announcing that it "intend[ed] to extend enforcement of the AWA to birds" and asking for "comments from the public to aid in the development of appropriate standards for birds." Regulations and Standards for Birds, Rats, and Mice, 69 Fed. Reg. at 31,537.  Although several individual USDA officials appear to have given misleading explanations about the scope of the agency's authority in response to complaints about the mistreatment of the feathered, these assertions contradict official USDA policy.  See Reply at 17 n.13.  If they did reflect USDA policy, PETA might well be able to invoke yet another exception to Chaney's presumption of unreviewability, which permits plaintiffs to challenge a non-enforcement decision that was "based solely on the belief that [the agency] lacks jurisdiction" over the matter.  Chaney, 470 U.S. at 833 n.4; see also id. at 839 (Brennan, J., concurring).  USDA would therefore be well advised to educate its officials on the agency's policy regarding birds – namely, that birds are regulated by the AWA and do fall under the agency's enforcement jurisdiction – and to ensure that they break their bad habit of misinforming the public on this matter.

These errors notwithstanding, in every D.C. Circuit case that PETA has cited where a plaintiff challenged an agency's general enforcement policy, the agency had somehow formally expressed that policy through some kind of official pronouncement.  See, e.g., OSG Bulk Ships,

Inc. v. United States, 132 F.3d 808, 811-12 (D.C. Cir. 1998) (agency sent letters to regulated

entities); Edison Elec., 996 F.2d at 330-31 (agency issued "Enforcement Policy Statement");

Nat'l Wildlife, 980 F.2d at 772-73 (agency promulgated regulation after notice-and-comment

rulemaking; see also Ctr. for Auto Safety, Inc. v. Nat'l Hwy Traffic Safety Admin., 342 F.

Supp. 2d 1, 6-8 (D.D.C. 2004) (agency sent letters to regulated entities). But see Roane v.

Holder, 607 F. Supp. 2d 216 (D.D.C. 2009) (permitting a general-enforcement-policy challenge

without mentioning whether a formal agency statement of that policy existed); Jones v. Office of

the Comptroller, 983 F. Supp. 197 (D.D.C. 1997) (same). Indeed, the case that first recognized

this exception to Chaney repeatedly referred to agencies' "expressions," "statements," and

"pronouncements" of their enforcement policies. Crowley, 37 F.3d at 677. While the Circuit

has also recognized that, in rare instances, "a document announcing a particular non-enforcement

decision" might "lay out a general policy delineating the boundary between enforcement and

non-enforcement and purport to speak to a broad class of parties" such that it could be

challenged as a statement of the agency's general enforcement policy, the documents PETA has

submitted in this case do not rise to that level. Id.

There is good reason, moreover, for requiring plaintiffs to cite to some kind of official,

concrete statement of the agency's general enforcement policy in order for them to invoke this

exception to Chaney. The D.C. Circuit permits general-enforcement-policy challenges in part

because they provide more material for courts to review: "An agency will generally present a

clearer (and more easily reviewable) statement of its reasons for acting when formally

articulating a broadly applicable enforcement policy, whereas such statements in the context of

individual decisions to for[]go enforcement tend to be cursory, ad hoc, or post hoc." Crowley,

37 F.2d at 677. But where, as here, a plaintiff simply alleges without proof that an agency has a

general policy of non-enforcement, there is by definition almost nothing for the Court to review, forcing it to "teas[e] meaning out of agencies' side comments, form letters, litigation documents, and informal communications" – one of the main reasons why plaintiffs are not permitted to challenge agencies' individual enforcement decisions.  Id.; see also Chaney, 470 U.S. at 832. The task is complicated even further where, as here, the agency affirmatively denies that it has a general non-enforcement policy, which sends the Court down the rabbit hole of reviewing the lawfulness of an agency policy that the agency insists does not even exist.

The Court concludes, therefore, that PETA's enforcement-related claim must fail.  To the extent that it is a challenge to individual decisions by USDA not to enforce the AWA with respect to particular avian incidents, those decisions are unreviewable because they are "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  To the extent that it is a challenge to USDA's "general enforcement policy" with respect to birds, PETA has not identified any concrete statement of that policy for the Court to review.  The Court, accordingly, will grant Defendants' Motion to Dismiss on this count.

### 2.   *Promulgation of Bird-Specific Regulations*

For its regulation-related claim, PETA again invokes § 706(1), asserting that USDA's failure to promulgate new regulations specific to birds constitutes "agency action unlawfully withheld."  In support of this argument, PETA cites to § 2143 of the AWA, which directs that "[t]he Secretary shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."  7 U.S.C. § 2143(a)(1). PETA therefore asks this Court to order that, by a certain deadline, USDA must publish for public comment, and then promulgate, new animal-welfare regulations tailored to birds.

USDA points out, however, that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is <u>required to take</u>." <u>Norton v. Southern Utah Wilderness Alliance</u>, 542 U.S. 55, 64 (2004). This limitation "rules out judicial direction of . . . agency action that is not demanded by law." <u>Id.</u> at 65. For instance, "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." <u>Id.</u>; <u>see also</u> <u>Citizens for Responsibility and Ethics in Washington v. SEC</u>, 916 F. Supp. 2d 141, 148 (D.D.C. 2013).

Section 2143 of the AWA does not require USDA to issue avian-specific animal-welfare standards. The statute simply directs the agency to promulgate standards for the "humane handling, care, treatment, and transportation of <u>animals</u>." 7 U.S.C. § 2143(a)(1) (emphasis added). By contrast, that same provision <u>does</u> require USDA to promulgate standards specific to "the exercise of dogs" and "the psychological well-being of primates." <u>Id.</u> at § 2143(a)(2)(B). Otherwise, though, the AWA leaves to USDA's discretion the question of whether specific standards are appropriate for each covered animal or if the general standards will suffice, authorizing "[t]he Secretary . . . to promulgate such rules, regulations, and orders <u>as he may deem necessary</u> in order to effectuate the purposes of this chapter." <u>Id.</u> at § 2151 (emphasis added); <u>see also</u> <u>Webster</u>, 486 U.S. at 600. In sum, the language of the AWA "would . . . support[] a judicial decree under the APA requiring the prompt issuance of [animal-welfare] regulations, but not a judicial decree setting forth the content of those regulations." <u>Southern Utah</u>, 542 U.S. at 65; <u>see also</u> <u>Missouri Coal. for the Env't Found. v. Jackson</u>, 853 F. Supp. 2d 903, 911-12 (W.D. Mo. 2012) (court could not compel EPA "to promulgate new or revised water quality standards . . . for a specific state" because the applicable statute "specifie[d] no standard

as to when a [state-specific regulation] should be issued, other than when the Administrator determines that it is necessary to 'meet the requirements of this chapter'"). The statute leaves USDA free to choose if it will stick with the general standards or issue new rules specific to birds.

PETA notes, however, that when USDA amended the regulatory definition of "animal" to include birds, it also made clear that it "d[id] not believe that the general [animal-welfare] standards . . . would be appropriate or adequate to provide for the humane handling, care, treatment, and transportation of birds" and that "it [was] necessary to consider what regulations and standards are appropriate for them." Regulations and Standards for Birds, 69 Fed. Reg. at 31,538-39. The agency has since repeatedly reaffirmed that such regulations are necessary and that it intends to promulgate them at some point in the future. See, e.g., 70 Fed. Reg. 64,097, 64,104 (Oct. 31, 2005); 71 Fed. Reg. 72,736, 72,738 (Dec. 11, 2006); 72 Fed. Reg. 69,755, 69,757 (Dec. 10, 2007); 73 Fed. Reg. 71,112, 71,117 (Nov. 24, 2008); 74 Fed. Reg. 21,873, 21,873 (May 11, 2009); 75 Fed. Reg. 21,736, 21,736 (Apr. 26, 2010); 76 Fed. Reg. 39,998, 40,003 (July 7, 2011); 78 Fed. Reg. 1,522, 1,526 (Jan. 8, 2013).

PETA links these pronouncements to the language of the AWA in order to construct the following syllogism: if USDA is authorized to promulgate animal-welfare regulations "as [it] may deem necessary . . . to effectuate the purposes of this chapter," 7 U.S.C. § 2151, and if USDA has concluded that bird-specific standards are "necessary" to ensure the welfare of those animals, Regulations and Standards for Birds, 69 Fed. Reg. at 31,538, then USDA is required to promulgate bird-specific animal-welfare regulations. Unfortunately for PETA, however, this chain of logic includes several weak links. First, USDA's conclusion that bird-specific regulations are "necessary to consider" may well sound in a different register from the AWA's

instruction that USDA should promulgate regulations that it deems "necessary . . . to effectuate

the purposes of [the AWA]."  In other words, the fact that USDA believes that it must

contemplate, and eventually adopt, bird-specific regulations does not mean that the agency has

concluded that those regulations are essential as of this moment; in the meantime, the agency

might believe that the general animal-welfare regulations will do just fine.   Second, PETA cites

no authority for the proposition that USDA's public statements can create binding obligations on

the agency enforceable under § 706(1).  On the contrary, the Supreme Court has indicated that

"[a] statement by [an agency] about what it plans to do, at some point, provided it has the funds

and there are not more pressing priorities, cannot be plucked out of context and made a basis for

suit under § 706(1)."  Southern Utah, 542 U.S. at 71; see also Chaney, 470 U.S. at 836

(questioning "whether an agency's rules might under certain circumstances provide courts with

adequate guidelines for informed judicial review of decisions not to enforce").

In a last-ditch effort to keep this case in court, PETA argues for the first time in its

Opposition that it is entitled to the relief it seeks pursuant to § 706(2) of the APA, which

authorizes the Court to "hold unlawful and set aside agency action, findings, and conclusions

found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law."  5 U.S.C. § 706(2).  PETA argues that USDA's failure to promulgate bird-specific

regulations is a failure to act that is arbitrary and capricious.  Unfortunately for PETA, however,

it did not raise this claim in its Complaint, and a "[p]laintiff is not permitted to advance a claim

in [its] Motion and Opposition that was not alleged in [its] Complaint."  Richardson v. Capital

One, N.A., 839 F. Supp. 2d 197, 202 (D.D.C. 2012); see also Palmer v. GMAC Commercial

Mortg., 628 F. Supp. 2d 186, 195 n.10 (D.D.C. 2009).  The Court will therefore not consider this

argument.

To recap, the AWA does not require USDA to adopt bird-specific standards.  USDA's statements that the general animal-welfare standards are not adequate to protect birds and that bird-specific standards should be considered do not impose an obligation on the agency enforceable under § 706(1) of the APA.  Defendants' Motion to Dismiss on this count thus succeeds.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss.  A separate Order consistent with this Opinion will be issued this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  December 16, 2013